AGNES CLIFT, AMY COCHRAN,       :
MOLLY JESSE, JEAN OSBORNE,      :
RITA MANTONE, and BRIDGET       :
MOUNT,                          :
                  Plaintiffs,   :
                                :     Case no. 2:12-cv-214
                                :
          v.                    :
                                :
City of Burlington, Vermont,    :
                                :
                  Defendant.    :
                                :

## Memorandum Opinion and Order

Six Vermont residents, Agnes Clift, Amy Cochran, Molly Jesse, Rita Mantone, Bridget Mount, and Jean Osborne (the "Plaintiffs") have brought facial and as-applied challenges to the constitutionality of Burlington Code § 21-113(2) (the "Ordinance") under 42 U.S.C. § 1983. The Ordinance creates a fixed buffer zone extending 35 feet from the premises of a reproductive health care facility ("RHCF") within which individuals may not "knowingly congregate, patrol, picket or demonstrate" unless they fall within one of five exemptions. The Plaintiffs claim that the Ordinance violates their First and Fourteenth Amendment rights because it discriminates on the basis of content and viewpoint; because it is an invalid time, place, and manner restriction; because it is substantially

overbroad; and because it is unconstitutionally vague.  Compl.
¶¶ 142-97, ECF No. 1.

Before the Court are two motions.  For the reasons stated
below, the Court **grants** the City's Motion to Dismiss the facial
challenges to the Ordinance, ECF No. 13, and **denies** Plaintiffs'
Motion for a Preliminary Injunction, ECF No. 8.

**BACKGROUND**

## I.    The Ordinance

On July 16, 2012, the Burlington City Council (the
"Council") amended the City's Code of Ordinances by adopting a
new article, Article IX, Health Center Buffer Zones.  Burlington
City Ordinance ("BCO") § 21-111 *et seq.*  Article IX consists of
five sections.

Section 21-111 lists the Council's findings.  The Council
recognized the need to balance individuals' First Amendment
"right to speak for or against certain medical procedures" with
other individuals' "right to obtain medical counseling and
treatment in an unobstructed manner."  BCO § 21-111.  The
Council explained that in adopting the Ordinance, its intention
was

> to ensure public safety and order, regulate the use of
> public sidewalks and other conduct, promote the free flow
> of traffic on streets and sidewalks, reduce disputes and
> confrontations requiring law enforcement services, protect
> property rights, protect First Amendment freedoms of speech
> and expression and secure a person's right to seek
> reproductive health care services.

*Id.* And the Council concluded that the limited buffer zone established by the Article was "necessary to ensure that patients have unimpeded access to reproductive health care services while also ensuring that the First Amendment rights of people to communicate their message to their intended audience is not unduly restricted or overburdened." *Id.*

Section 21-112 defines several terms used throughout Article IX:

(1)  *Reproductive Health Care Facilities* shall mean any building, structure or place, or any portion thereof, at which licensed, certified, or otherwise legally authorized persons provide health care services or health care counseling relating to the human reproductive system.

(2)  *Buffer Zone* means an area of protection surrounding the premises of a Reproductive Health Care Facility that has a thirty-five (35) foot radius extending in all directions.

(3)  *Premises of a Reproductive Health Care Facility* shall mean the driveway, entrance, entryway, or exit of a Reproductive Health Care Facility and any parking lot in which the facility has an ownership, easement or leasehold interest or other property right.

(4)  *Person* shall include, but is not limited to
    1. Individuals;
    2. Corporations;
    3. Not-for profit organizations;
    4. Partnerships;
    5. Associations; and
    6. Groups or other entities.

*Id.* at § 21-112.

Section 21-113 contains two separate provisions. Subsection (1), which is not challenged by Plaintiffs, prohibits

individuals from knowingly obstructing, detaining, hindering, impeding or blocking another person from entering or exiting an RHCF.  Subsection (1) does not apply to certain municipal agents such as firemen and utility workers nor to employees or agents of an RHCF acting within the scope of their employment. Subsection (2), the provision at issue in this suit, states that "[n]o person or persons shall knowingly congregate, patrol, picket or demonstrate in the Buffer Zone."  *Id.* at § 21-113(2). Subsection (2) expressly exempts five categories of individuals from this general prohibition: (1) "persons entering or leaving [an RHCF]"; (2) "employees or agents of [an RHCF] acting within the scope of their employment"; (3) "law enforcement, ambulance, firefighting, construction, utilities, public works, and other municipal agents acting within the scope of their employment"; (4) "persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility"; and (5) "any person or persons on private property having the consent of the property owner."  *Id.*

Section 21-114 authorizes civil penalties ranging from fifty to five hundred dollars for violations of the Article.

Section 21-115 contains a severability clause.

## II. Planned Parenthood

### A. The Buffer Zone

The Plaintiffs allege that the Ordinance, which came into effect on August 15, 2012, has severely disrupted their ability to approach, counsel, and distribute information to individuals approaching Planned Parenthood's Burlington Health Center ("Planned Parenthood") at 183 St. Paul Street. St. Paul Street runs north to south and has two travelling lanes (one in each direction) and parking spaces on both shoulders. Traffic is intermittent, and noise levels vary throughout the day. On both sides of the street, there is a small strip of grass and a public sidewalk running parallel to the road. Planned Parenthood occupies a single building with a main entrance accessible from the sidewalk on the west side of the street. Planned Parenthood also leases several parking spaces for its clients in a privately-owned lot located directly south of the building, Compl. ¶¶ 37-40; however, the lot is not in use at the moment because an underground parking facility is under construction.[1] *See* Pls.' Exs. 12-14.

The layout of the buffer zone at Planned Parenthood is not disputed. It consists of two areas: a half-circle with a radius of 35 feet centered on the main entrance of the facility and a

---

[1] For the purposes of the instant motions, the Court will presume that the parking lot is part of the premises of Planned Parenthood, despite the fact that it is currently under construction.

quasi-trapezoid[2] extending 35 feet to the north, south, and east of the lot. *See* Def. Ex. A. The two areas overlap, causing a continuous 228-foot stretch of sidewalk to fall within the buffer zone.[3] Compl. ¶ 43. Because the west curb of St. Paul Street is 22 feet from the facility, the buffer zone extends as much as 13 feet into the street, just short of the lines that divide the travelling lanes.[4] *Id.* at ¶¶ 38; Def. Ex. A.

## B. Application of the Ordinance

The buffer zone at Planned Parenthood does not prevent individuals from congregating, patrolling, picketing, or demonstrating once they are 35 feet or more away from the main entrance and parking lot of the facility. In theory, this means a person could occupy any space along the edge of the buffer zone; however, because of where it falls in relation to St. Paul Street, individuals may congregate, patrol, picket, and demonstrate in three stretches by Planned Parenthood. First, they may stand south of the buffer zone on the same side of the street as the facility, a location that is 193 feet from the main entrance. The Plaintiffs seldom occupy this location. Second, they may stand north of the buffer zone, where they are

---

[2] In strict geometrical terms, this portion of the Planned Parenthood buffer zone is not a trapezoid because its legs are rounded.
[3] The main entrance is 58 feet from the northernmost edge of the lot. Only if the distance between these points were more than 70 feet would there be a complete gap between the 35 foot buffer zone around the entrance and the 35 foot zone around the lot.
[4] All distances are rounded to the nearest foot and are approximate.

roughly 35 feet from the main entrance.  This location is directly in front of a hair salon, and although Plaintiffs occasionally stand there, they generally try to avoid it to accommodate the salon-owner's concerns that their activities would harm his business.[5]  Finally, the Plaintiffs may stand on the opposite side of St. Paul Street, across from Planned Parenthood's main entrance or parking lot.  This has been the primary location of the Plaintiffs' activities since the Ordinance came into effect, and from that area, the Plaintiffs are at least 68 feet from the main entrance to Planned Parenthood.  Compl. ¶ 46.  After the Ordinance came into effect, the City marked off the last metered parking spot on the east side of St. Paul Street for Plaintiffs so that they would be more visible to persons entering or exiting Planned Parenthood. *Id.* ¶ 47.

Although the Plaintiffs are willing to share their views with passers-by and to provide information to individuals leaving the facility, their target audience is women who are entering Planned Parenthood to receive counseling or medical services.  In the Plaintiffs' experience, close, personal contact with that audience is the most effective way to communicate their message.  Though each of the Plaintiffs

---

[5] There is no allegation that any City official has requested that the Plaintiffs vacate this location.

expresses herself in a slightly different manner, they all agree
that shouting from a distance is generally counter-productive.
In an affidavit, Ms. Clift explained,

> I have found that close personal communication, in a normal
> conversational voice level, with a kind, gentle voice, and
> with eye contact, using very few words-from a distance of
> six to ten feet-is the only way to effectively communicate
> with women at Planned Parenthood.  I have found that eye
> contact and a smile are very important to get these women
> to be responsive. I often merely ask them if they would
> please take my brochure. My experience tells me that
> communicating in this manner is the best way to provide
> information and assistance to women seeking abortion.

Clift. Dec., ECF No. 8-10, ¶ 27.

The Plaintiffs claim that individuals entering the facility
cannot hear them from any of the locations outside of the buffer
zone unless they shout.  The physical separation imposed by the
buffer zone combined with ambient noise on the street from
traffic or construction occasionally prevents them from being
heard at all.  The Plaintiffs' ability to distribute leaflets
has also been significantly compromised.  Many individuals
entering the facility arrive by car and either park or are
dropped off within the buffer zone.  Theoretically, the
Plaintiffs may still reach persons arriving by foot; however, it
can be hard to identify whether a pedestrian is heading to the
facility or simply walking past until that individual has
entered the buffer zone.  In fact, in the months since the
Ordinance came into effect, only once have the Plaintiffs given

a leaflet to a person entering or leaving the facility. The buffer zone interferes less with Plaintiffs' other activities, which include holding signs, engaging in silent and vocal prayer, calling out to individuals entering the facility, and singing. The buffer zone has no impact on the Plaintiffs' ability to communicate with individuals who voluntarily leave the buffer zone to speak with them or to pick up a leaflet; however, in practice, that is a relatively rare event.

None of the Plaintiffs have received tickets for violating the buffer zone at Planned Parenthood, but they have received verbal and written warnings from officers of the Burlington Police Department. For example, on August 15, 2012, Plaintiff Jean Osborne walked into the buffer zone to offer a leaflet to a couple that was approaching Planned Parenthood on foot. Compl. ¶ 61. After the couple declined, Osborne returned to the edge of the buffer zone. *Id.* Shortly thereafter, Officer Mike Warren arrived on the scene and spoke with Osborne. Officer Warren warned her that she would be ticketed if she continued to try to distribute leaflets inside the buffer zone. *Id.* When Osborne objected on the grounds that leafleting was not explicitly prohibited under the Ordinance, Officer Warren replied that any activity inside the zone was prohibited.

Later that day, another one of the Plaintiffs, Amy Cochran, entered the buffer zone to read her prayer book on a grass strip

next to the sidewalk in front of Planned Parenthood. *Id.* ¶ 62.
Officer Kim Shelley of the Burlington Police Department
responded to a call reporting a violation of the buffer zone.
Upon her arrival, Officer Shelley "observed Amy Cochran kneeling
down on the greenbelt across from the entrance to the facility."
Def. Ex. G. Shelley "heard Cochran mumbling something about
'God' and 'help these women.'" *Id.* Shelley then spoke with
Cochran about the Ordinance and explained that no demonstrating
was permitted within 35 feet of the building. *Id.* Shelley
issued Cochran a written warning, escorted her out of the buffer
zone, and informed her of an informational meeting about the
Ordinance that would be taking place at City Hall later in the
day. *Id.*; Pls.' Ex. 18.

On the morning of January 23, 2013, Barry Kade, a pro-
choice and free speech activist, began distributing leaflets in
front of Planned Parenthood. Kade's leaflets expressed
opposition to the Ordinance and asked city residents to call for
its repeal. After 20 minutes, two Burlington police officers
arrived on the scene and requested that Kade leave. Kade
refused to do so unless he was given a ticket or a written
warning. One of the officers, Lieutenant Kathleen Stubbing,
entered Planned Parenthood to speak with employees of the
facility. When she emerged a few minutes later, Kade informed
her that he would be leaving the buffer zone but requested that

she let him know when officers would begin issuing tickets for violations of the Ordinance. *See* Pls.' Ex. 20. Later that week, Kade sent an email to Lieutenant Stubbing asking her whether she would have given him a ticket if he had stayed. She simply responded that the police department remains "in the educational phase [in] reference [to] this ordinance." *Id.*

On August 15, 2012 and at other times since the Ordinance came into effect, Planned Parenthood employees or agents have been stationed at the main entrance to escort individuals approaching the entrance. *Id.* ¶¶ 60, 63, 65–66. The Plaintiffs allege that these escorts have on at least two occasions interfered with their efforts to communicate with people entering Planned Parenthood. For instance, on August 29, 2012, Cochran was standing at the north end of the buffer zone with a sign containing the words "I REGRET MY ABORTION." Cochran claims that when two individuals approached the main entrance from the south, two Planned Parenthood escorts walked in front of and alongside them in a manner that blocked their view of Cochran's sign. And on September 5, 2012, a male and female were standing together outside Planned Parenthood smoking cigarettes. When Plaintiff Bridget Mount called out to the couple and offered information, a Planned Parenthood escort led them into the building.

Rebecca Galvin, who served as a volunteer escort at Planned Parenthood while the Ordinance was in effect (and has since been hired as a part-time employee) testified that she and other escorts are trained to greet clients and to walk them to the entrance of Planned Parenthood without engaging them in any substantive conversation.[6]  Planned Parenthood instructs escorts

---

[6] The Court engaged Galvan in the following dialogue:

> THE COURT: When you are serving as an escort, an outdoor escort, someone is approaching Planned Parenthood for services, you go out and meet them within the buffer zone?
>
> THE WITNESS: Within the buffer zone. Because there's a distance between the parking lot and the entrance to the facility, I have gone out to that corner. If they have parked in the parking lot, they're coming around the corner, I will often go out to be there and identify myself as an escort and state that I will -- that I am going to just walk them to the door, and that's about the extent of that interaction.
>
> THE COURT: And what will you talk about?
>
> THE WITNESS: I don't -- I try not to talk. I just -- my idea is just to provide a physical presence if they're -- and they often are appearing alarmed or concerned, and I will just walk with them to the door, but there's not conversation.
>
> THE COURT: I wonder if the staff at Planned Parenthood are instructed to say anything in regard to the services that are provided by Planned Parenthood?
>
> THE WITNESS: No, we are instructed not to say anything about the services that are provided. I mean, we are -- we are -- as escorts, we are neutral and we are simply there --
>
> THE COURT: Okay. So that the --
>
> THE WITNESS: -- for support.
>
> THE COURT: So the communication within the buffer zone between an escort or employee of Planned Parenthood and the person who is seeking services, essentially, is -- there's no content to it?

not to engage in any advocacy, and in Galvin's experience, they

follow that directive.  Galvin also testified that despite the

intermittent traffic flow on St. Paul Street, she is able to

hear the Plaintiffs when she is standing by the entrance to

Planned Parenthood.[7]  She had no doubt that patients approaching

Planned Parenthood could also hear communications from the other

side of the street because they often reacted with fear,

confusion, or anger.[8]

---

THE WITNESS: There shouldn't be any content to it. I never had
any content to mine. It was just to identify, first of all, that
I was -- that I was a part of Planned Parenthood because, as
patients arrive, they would be -- if -- when they saw protestors,
sometimes they'd be visibly alarmed, and I was just identifying
myself as being part of Planned Parenthood and stating that I
would walk with them to the door, and that's it.

THE COURT: Okay. And there's nothing said in regard to advocacy
of a pro-choice viewpoint or an anti-protestor viewpoint?

THE WITNESS: We have been clearly – pretty clearly instructed not
to do that and trained not to do that by Planned Parenthood.

Draft Transcript of Hr'g on Mot. to Dismiss and Mot. for Prelim. Inj.
("Draft Tr.") vol. 3, 17-19, Jan. 30, 2013.
[7] *Id.* at 15.
[8] At the hearing, the City's counsel and Galvin had the following
exchange:

Q    . . . [D]o you recall the impact of statements coming from
across the street or communications from across the street on
patients coming into the Planned Parenthood?

A    Yes. Patients coming to Planned Parenthood often will react
with confusion and sometimes fear and sometimes anger to the
presence of those protestors across the street.

Q    Is there any doubt in your mind that their communication is
getting through to these patients of Planned Parenthood as they
enter?

A    No doubt whatsoever. None.

### III. The Ordinance Educational Meeting

     Since the Ordinance came into effect, Plaintiffs have
expressed confusion about the scope of the activities prohibited
in the buffer zone.  They profess not to understand the meaning
of the terms "congregate" or "patrol"; they think the terms
"demonstrating" and "picketing" do not cover some of their
activities, including prayer and singing; and they are confused
by the scope of the exception for "persons using the public
sidewalk . . . *solely* for the purposes of reaching a destination
other than [an RHCF]."  BCO § 21-113(2)(a)(4) (emphasis added).

     Partially to address these concerns, city officials held an
educational meeting at City Hall on August 15, 2012, to explain
how they planned to enforce the Ordinance.  Deputy Police Chief
Jennifer Morrison, Assistant City Attorney Gene Burgman, and
Assistant to the Mayor Carina Driscoll all spoke on behalf of
the City.  Pls.' Ex. 11.  Plaintiffs Agnes Clift, Molly Jesse,
and Bridget Mount were among those in attendance.  During the
meeting, the city officials acknowledged that administering the
Ordinance would require police to consider the spirit, not just
the letter of the law.  For example, when the Plaintiffs asked
whether praying inside the buffer zone constituted a violation
of the Ordinance, the city officials explained that the police

_____

*Id.*

officer at the scene would have to determine whether the
hypothetical praying amounted to a demonstration and was
therefore subject to the Ordinance. *Id.* Driscoll, the Mayor's
assistant, explained that "the intent of the Ordinance was so
that people entering RHCFs did not have to face demonstrators or
be bothered." *Id.* When asked to define the meaning of the key
terms of the Ordinance, city officials advised the attendees
that they would need to arrive at their own understanding of
those terms by consulting a dictionary. *Id.*

Deputy Police Chief Morrison also explained that the Police
Department would be entering an "educational phase" of enforcing
the Ordinance and sought the Plaintiffs' cooperation:

> The ordinance has been passed. It has been conveyed to us.
> We are expected to be the enforcement arm of this
> ordinance. So we are going to do our best to work with
> people, to educate them, and to ask for compliance from
> them. It is not the desire of the Burlington Police
> Department to become adversarial. We understand that you
> have a very strong position about wanting to be there and
> to be where folks are accessing this area, but we also
> understand that the ordinance is clear that it's creating a
> buffer zone. So, there, there is definitely, a lot of--
> some discretion in here as to what constitutes a
> demonstration, picketing, etc. In days ahead, will we need
> to flush out specifics of that? Maybe. . . .

Pls.' Ex. 11. When asked whether specific activities such as
praying within the buffer zone would constitute "demonstrating,"
Deputy Chief Morrison gave the following response:

> I think I can't give you a black-or-white answer. I think
> I'm going to tell you this: that if I am the officer
> dispatched to the scene, and I perceive that your act of

standing within the buffer zone and praying or doing
whatever you are doing constitutes a quote "demonstration,"
then I will -- then that officer will be expected to
enforce the ordinance. I think there's going to be a level
of discretion that is involved here.  And I think I would
ask you that, really candidly, if there[ are] issues like
that that need to be clarified, let's do it through the
wording of the language, let's work on it together.  Let's
not put our backs up and see how far we can go until we
force a police officer to take action.  We're talking about
folks who are out there doing the best they can,
exercising—you know—under an ordinance that has some grey
in it.  Let's work together to make it clear what is and
isn't allowed, but let's not get into an adversarial
position with the police officers on the street.

*Id.*

After the Ordinance Educational Meeting, Plaintiff's
counsel, Norman Smith, sent a letter to Burlington Police Chief
Michael Schirling requesting clarification as to whether the
following activities were lawful within the buffer zone:
offering literature, one-on-one oral communications, praying out
loud, praying silently, praying silently while wearing a pro-
life t-shirt, reading the Bible while wearing a pro-life t-
shirt, singing, and singing while wearing a pro-life t-shirt.
Letter to Chief Schirling, ECF. No. 8-26.  The letter also
requested clarification as to whether the Ordinance "prohibit[s]
a non-exempt person from being inside the [buffer] zone for *any*
purpose except to reach a destination other than a reproductive
health care facility."  *Id.*  In response, Chief Schirling stated
that he could not answer those questions and referred the
Plaintiffs to the City Attorney.

## IV.  Care Net

The Plaintiffs also allege that the Ordinance has been enforced differently at Care Net, a pro-life RHCF, than it has been at Planned Parenthood, which is pro-choice.  Compl. ¶¶ 61-67, 86-96.  For one, the City has posted five signs[9] around Planned Parenthood demarcating the buffer zone but has not done the same at Care Net.  Clift Dep. ¶¶ 36, 60, ECF No. 8-10.  It is not clear whether the City installed the signs pursuant to Planned Parenthood's request and, if so, whether Care Net has made a similar request.

On two occasions, protesters associated with the pro-choice group FED-UP Vermont have demonstrated within the buffer zone at Care Net.  The first occurred on September 11, 2012.  At approximately 5:30 p.m., Deb Coulture, the Executive Director of Care Net, called the Burlington Police to report the protest.  Fifteen minutes later, Lieutenant Scott Davidson arrived on the scene and entered Care Net to speak with Coulture.  Lieutenant

---

[9] The signs read:

> REPRODUCTIVE
> HEALTH
> CENTER
> BUFFER ZONE
> NO CONGREGATING,
> PATROLLING,
> PICKETING, OR DEMONSTRATING
> IN ZONE
> BCO § 21-113

Pls.' Ex. 14.

Davidson asked Coulture what she wanted him to do and told her
that the protesters had argued that the Ordinance did not apply
to Care Net because it was not "a medical center." Decl. Deb
Coulture ¶ 5, ECF No. 8-8. Coulture explained that Care Net
provides reproductive health care services, including
counseling, ultrasound, and pregnancy verification and stated
that she wanted the protesters to abide by the buffer zone. *Id.*
According to Coulture, Lieutenant Davidson told her that the
protesters would be done shortly, expressed the opinion that the
Ordinance was "ridiculous," and asked her if she "really
want[ed] to tie up an officer for the next 18 minutes." *Id.* at
¶ 6. When Coulture repeated her request that he enforce the
Ordinance, Lieutenant Davidson replied, "Do you want me to
ticket them? It will take a lot longer than 18 minutes to ticket
all of them. They are going to be gone in a little while. Do
you really want me to tie up an officer when there are more
important things going on in the city?" *Id.* Lieutenant
Davidson then left the building, but he did not attempt to move
the protesters out of the buffer zone. Compl. ¶ 96. Half an
hour later, he returned and told Coulture that the demonstrators
were leaving.

The second incident occurred on October 9, 2012. Terri
Seward, the Development Director of Care Net, called the
Burlington Police Department at approximately 5:40 p.m. to

report that around ten protesters were demonstrating 12 to 15 feet from Care Net's entrance. After describing the basic circumstances of the protest to the dispatcher, Seward was placed on hold for several minutes. Def. Ex. M. Seward called the Department again, at which point she spoke to a different dispatcher, who informed her that the reason for the delay was that the Department was responding to several emergencies at that time. Seward told the dispatcher that the protest would probably be wrapping up around 6 p.m. anyway. The dispatcher advised Seward that an officer would return her call as soon as one became free. *Id.* Seward observed two marked police vehicles pass Care Net during the protest, but neither stopped to respond to her call.

Police Officer Brownell returned Seward's call around 7:30 that evening. Officer Brownell explained that he had driven past the protest earlier in the evening while he was responding to another engagement. He advised Seward "to call again if there were any issues in the days to follow" but that "since the protesters were no longer on the scene, it would not be possible to take action [that night]." Def. Ex. N. At the end of the call, Seward requested that Officer Brownell speak with a fellow officer, Andi Higbee, who was in contact with Care Net after the September 11 incident, and to follow up with a board member at Care Net.

## I.    Protest Buffer Zones and the First Amendment

This case presents the question of whether the City of Burlington may prohibit individuals from knowingly congregating, patrolling, picketing, or demonstrating within 35 feet of reproductive health care facilities.  Fortunately, it is not one that the Court must answer on its own.  Over the last twenty years, the Supreme Court and several circuit courts have addressed the constitutionality of provisions that are substantially similar, though certainly not identical, to the Ordinance.  A detailed summary of those cases follows, but two features of the framework they apply warrant emphasis at the outset.

First, restrictions on speech are subject to differing levels of scrutiny.  Regulations that proscribe or burden speech on the basis of its content or viewpoint must endure strict scrutiny, the most exacting standard.  *See, e.g. R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 386 (1992) ("The government may not regulate [speech] based on hostility-or favoritism-towards the underlying message expressed.").  Such content-based restrictions are "presumptively invalid," *id.* at 382, and must be the least restrictive means of promoting a compelling government interest.  *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813 (2000).  Restrictions on the time,

place, and manner in which speech may occur—that is, restrictions that burden speech incidentally and for reasons unrelated to its content or viewpoint—are subject to intermediate scrutiny. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994). They must be "narrowly tailored to serve a significant governmental interest" and must "leave open ample alternative channels for communication." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). The cases discussed below make clear that protest buffer zones are subject to intermediate scrutiny as long as they are not drafted or enforced in way that discriminates on the basis of content or viewpoint.

Second, challenges to the constitutionality of a regulation may proceed on a facial or as-applied basis.[10] When addressing the former, courts principally look to the text of the statute or ordinance to determine whether it has a "plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008). How the regulation has been enforced and how it impacts the litigants in a particular circumstance are generally considerations reserved for as-applied, not facial challenges.

A. *Madsen, Schenck*, and *Hill*

---

[10] A categorical distinction between facial and as-applied challenges may be unwarranted in theory, *see* Richard H. Fallon, Jr., Commentary, *As-applied and Facial Challenges* and *Third-Party Standing*, 113 Harv. L. Rev. 1321, 1322-23 (2000); however, the posture of this case requires the Court to distinguish between the two.

The Supreme Court has decided three cases involving buffer zones at medical facilities.  In *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753 (1994) and *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357 (1997), the Supreme Court first confronted the issue in the context of court-issued injunctions prohibiting specific individuals or organizations from interfering with public access to clinics.  In *Madsen*, a Florida state court initially enjoined a group of protesters from blocking or interfering with access to an abortion clinic in Melbourne, Florida.  512 U.S. at 757-58.  After that provision proved insufficient, the state court expanded its injunction to prohibit the protesters

> (2) At all times on all days, from blocking, impeding, inhibiting, or in any other manner obstructing or interfering with access to, ingress into and egress from any building or parking lot of the Clinic.
>
> (3) At all times on all days, from congregating, picketing, patrolling, demonstrating or entering that portion of the public right-of-way or private property within [36] feet of the property line of the Clinic . . . .[11]
>
> . . . .
>
> (5) At all times on all days, in an area within [300] feet of the Clinic, from physically approaching any person seeking the services of the Clinic unless such person indicates a desire to communicate by approaching or by inquiring of the [petitioners] . . . .

---

[11] The injunction contained several exceptions to the 36-foot buffer, including an adjustment to its size on one side of the clinic and exemptions for nearby property owners and their invitees.  *Madsen*, 512 U.S. at 759-60.

*Id.* at 759-60.

Reviewing the revised injunction, the Supreme Court determined that it was not content or viewpoint-based simply because it applied only to anti-abortion protesters; after all, they were the ones whose conduct gave rise to underlying lawsuit and justified the injunction. *Id.* at 762-63. The Court also recognized that the injunction served a variety of legitimate government interests, including preserving a woman's freedom to seek lawful medical and counseling services, maintaining public safety and order, promoting the free flow of traffic on public streets and sidewalks, and protecting patients' privacy concerns. *Id.* at 767-68.

Whether each provision of the injunction was narrowly tailored to serve those interests presented a more difficult question. Explaining that court-issued injunctions generally pose a greater risk of "censorship and discriminatory application," the Court applied a more exacting standard than it would have for an identically-phrased legislative enactment. *Id.* at 764. Instead of considering whether the injunction "promote[d] a substantial government interest that would be *achieved less effectively absent the regulation*," *Ward*, 491 U.S. at 799 (emphasis added), the Court demanded that each provision "'be *no more burdensome to the defendant than necessary* to provide complete relief to the plaintiffs.'" *Madsen*, 512 U.S.

at 765 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979))

(emphasis added). Using this heightened standard, the Court

upheld the 36-foot fixed buffer zone (with respect to public but

not private property) because it was necessary to protect access

to the clinic; however, the Court struck down the prohibition on

approaching patients or potential patients within 300 feet of

the clinic because it burdened more speech than necessary. *Id*.

at 768-76.[12]

Three years later, in *Schenck*, the Supreme Court revisited

the issue when it considered the constitutionality of a

preliminary injunction prohibiting abortion protesters from

"'demonstrating within fifteen feet from either side or edge of,

or in front of, doorways or doorway entrances, parking lot

entrances, driveways and driveway entrances of such facilities'

(fixed buffer zones), or 'within fifteen feet of any person or

vehicle seeking access to or leaving such facilities' (floating

buffer zones)." 519 U.S. at 367. Once again, the Court

determined that the governmental interests in "ensuring public

safety and order, promoting the free flow of traffic on streets

and sidewalks, protecting property rights, and protecting a

woman's freedom to seek pregnancy-related services" were

"significant enough to justify an appropriately tailored

---

[12] The Court also rejected vagueness and overbreadth challenges to the injunction for reasons not directly relevant to the Plaintiffs' claims here. *Madsen*, 512 U.S. at 775-76.

injunction," *id.* at 376; however, the Court concluded that only the fixed buffer zone was in fact necessary to serve those interests. *Id.* at 376-82. In doing so, the Court acknowledged that the fixed buffer zone was a prophylactic measure, especially because an unchallenged portion of the injunction prohibited "blocking, impeding or obstructing access" to the clinic, but the Court deferred to the District Court's assessment that the fixed buffer zone was necessary to keep the clinic entrances clear. *See id.* The Court in *Schenck* also swiftly rejected the suggestion that the term "demonstrating" was unconstitutionally vague, finding that when the injunction was read as a whole, "people 'of ordinary intelligence' (and certainly defendants whose demonstrations led to this litigation in the first place) have been given a reasonable opportunity to know what is prohibited.'" *Id.* at 383 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972)).

In *Hill v. Colorado*, the Supreme Court addressed the constitutionality of a legislatively-enacted buffer zone for the first time. 530 U.S. 703, 730 (2000). In 1993, the Colorado General Assembly enacted a statute making it a misdemeanor to

> knowingly approach another person within eight feet of such person, unless such other person consents, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person in the public way or sidewalk area within a radius of one hundred feet from any entrance door to a health care facility.

Colo. Rev. Stat. § 18-9-122(3).  The General Assembly defined
the term "health care facility" broadly to include "any entity
that is licensed, certified, or otherwise authorized or
permitted by law to administer medical treatment in [Colorado]."
*Id.* at § 18-9-122(4).  And the General Assembly enacted a
related provision making it a separate misdemeanor to "knowingly
obstruct[], detain[], hinder[], impede[], or block[] another
person's entry to or exit from a health care facility."  *Id.* at
§ 18-9-122(2).

Despite having struck down similar provisions in *Madsen* and
*Schenck*, the Court upheld the 8-foot floating buffer zone in
*Hill*.  Though the petitioners did not challenge the
substantiality of the State's interest in enacting the statute,
the Court reaffirmed the proposition that the state's general
police powers "justif[ied] a special focus on unimpeded access
to health care facilities and the avoidance of potential trauma
to patients associated with confrontational protests."  *Hill*,
530 U.S. at 715.  The Court also clarified that the State could
take into account "the interests of unwilling listeners in
situations where 'the degree of captivity makes it impractical
for the unwilling viewer or auditor to avoid exposure.'"  *Id.* at
718 (quoting *Erznoznik v. City of Jacksonville*, 422 U.S. 205,
209 (1974)).

Applying intermediate scrutiny, the Court found that the statute was also narrowly tailored and left open ample alternative channels for communication. *Hill*, 530 U.S. at 725-30. While the Court noted that the 8-foot separation would have little impact on demonstrators' ability to convey their message with signs, the Court conceded that the separation might make it more difficult for a speaker to be heard. *Hill*, 530 U.S. at 726. But because the statute placed no restriction on the use of amplification equipment, allowed a speaker to converse at a "normal conversational distance," and permitted protesters to remain stationary while individuals passed within 8 feet of them, there were sufficient alternative avenues of communication available to the protesters. *Id.* at 727-28.

Though the Court was also troubled by the burden placed on protesters' ability to distribute handbills, it noted that the statute did not "prevent a leafletter from standing near the path of oncoming pedestrians and proffering his or her material, which the pedestrians can easily accept." *Id.* at 727. The Court's discussion revealed that it would not insist on the least restrictive or least intrusive means of fulfilling the State's statutory goals, even when core forms of expression were burdened. Echoing *Schenck*, the Court explained that while the statute might "sometimes inhibit a demonstrator whose approach in fact would have proved harmless," this "aspect is justified

by the great difficulty of protecting, say, a pregnant woman from physical harassment with legal rules that focus exclusively on the individual impact of each instance of behavior, demanding in each case an accurate characterization (as harassing or not harassing) of each individual movement within the 8-foot boundary." *Id*. at 729. "A bright-line prophylactic rule," the Court reasoned, "may be the best way to provide protection and, at the same time, by offering clear guidance and avoiding subjectivity, to protect speech itself." *Id.*

Finally, the Court rejected petitioners' contentions that the statute was unconstitutionally overbroad and vague in quick succession. The Court explained that it considered the statute's applicability to all persons and all health care facilities to be a constitutional "virtue, not a vice, because it was evidence against there being a discriminatory governmental motive." *Id.* at 731. As the statute simply amounted to a restriction on the places where certain communications could occur, rather than a complete ban, the Court insisted that the petitioners demonstrate that the overbreadth of the statute was both real and substantial—a threshold they could not meet. *Id.* at 731-32. When it addressed the vagueness challenge, the Court relied heavily on the presence of a scienter requirement, which in their view rendered quite remote the likelihood that a person of ordinary

intelligence would not understand what conduct the statute prohibits. *Id.* at 732. Though the petitioners conjured up numerous hypothetical situations to test whether certain conduct would be proscribed by the statute, the Court, looking to the statute as a whole, thought that the statute was clear about what it prohibited and that its application was valid in the "vast majority of its intended applications." *Id.* at 733 (quoting *State v. Raines*, 362 U.S. 12, 23 (1960)).

### B.  Buffer Zones in the Circuit Courts

The Second Circuit has considered the validity of buffer zones in two cases, both of which involved injunctions restraining anti-abortion protesters. In *United States v. Scott*, the defendant was convicted of violating the Freedom of Access to Clinic Entrances Act ("FACE") "'by using physical obstruction to intentionally injure, intimidate or interfere with, or attempt to injure, intimidate or interfere with, [a clinic's] patients, escorts, and staff because they were obtaining or providing reproductive health services' and on at least two occasions by using the threat of force." 187 F.3d 282, 284-85 (2d Cir. 1999) (quoting *United States v. Scott*, 958 F. Supp. 761, 775-76 (D. Conn. 1997)). After repeated violations of a narrower injunction, the District Court precluded Scott from entering within 28 feet of the clinic's entrance or within 8 feet of persons and their vehicle after

they have verbally indicated no interest in literature or counseling. On appeal, the Second Circuit upheld both the fixed and the floating buffer zones, but the principal focus of the decision was the floating buffer zone. The Court distinguished *Schenck* on the grounds that Scott's buffer zone was smaller and permitted Scott to approach individuals until they expressed disinterest in his message. *Scott*, 187 F.3d at 288.

In *New York ex rel. Spitzer v. Operation Rescue National*, the Second Circuit reviewed a preliminary injunction that, among other things, expanded previously-imposed fixed buffer zones at two facilities from 15 to 60 feet.[13] 273 F.3d 184, 192 (2d Cir. 2001). Although the Second Circuit determined that the injunction was content-neutral and served significant governmental interests, it struck down the enlarged, 60-foot buffer zones because they were "more extensive than necessary" to preserve access to the clinics. *Id.* at 203. The Court nevertheless left the original 15-foot buffer zone intact. *Id.* at 209.

Cases from several other circuits also merit consideration because of their factual similarities to the one at hand. The First Circuit has rejected a series of challenges to a

---

[13] The injunction prohibited the defendants from "demonstrating, congregating, standing, sitting, or lying on, or posting or carrying signs, or being present within fifteen feet of either edge of any doorway, walkway, or driveway entrance" to any covered facility. *Operation Rescue Nat'l*, 273 F.3d at 192. The Second Circuit did not discuss whether these terms were vague.

Massachusetts statute establishing buffer zones around reproductive health care facilities. *See McGuire v. Reilly* ("*McGuire I*"), 260 F.3d 36 (1st Cir. 2001); *McGuire v. Reilly* ("*McGuire II*"), 386 F.3d 45 (1st Cir. 2004); *McCullen v. Coakley* ("*McCullen I*"), 571 F.3d 167 (1st Cir. 2009); *McCullen v. Coakley* ("*McCullen II*"), No. 12-1334, 2013 WL 85928 (1st Cir., Jan. 9, 2013). The statute was most recently amended in 2007 to create fixed buffer zones comprising

> a radius of 35 feet of any portion of an entrance, exit or driveway of a reproductive health care facility or within the area within a rectangle created by extending the outside boundaries of any entrance, exit or driveway of a reproductive health care facility in straight lines to the point where such lines intersect the sidelines of the street in front of such entrance, exit or driveway.

*McCullen I*, 571 F.3d at 173.

Much like the Burlington Ordinance, the Massachusetts statute provides that no person may "knowingly enter or remain on a public way or sidewalk adjacent to a reproductive health care facility," *id.* at 173, and it exempts four classes of persons:

> (1) persons entering or leaving such facility;
>
> (2) employees or agents of such facility acting within the scope of their employment;
>
> (3) law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; and

> (4)  persons using the public sidewalk or street right-of-
>       way adjacent to such facility solely for the purpose
>       of reaching a destination other than such facility.

*Id.* at 173-74.[14]  In *McCullen I & II*, the First Circuit rejected

facial and as applied challenges to the statute.  *See McCullen*

*I,* 571 F.3d at 184; *McCullen II*, 2013 WL 85928 at *10-13.

In *Brown v. City of Pittsburgh*, 586 F.3d 263 (3d Cir.

2009), the Third Circuit addressed the constitutionality of a

Pittsburgh ordinance establishing a floating buffer zone

virtually indistinguishable from the Colorado statute in *Hill*,

as well as a fixed buffer zone of 15 feet within which "[n]o

person or persons shall knowingly congregate, patrol, picket, or

demonstrate." *Brown*, 586 F.3d at 267, 273.  Although the Third

Circuit determined that each of the provisions was facially

valid on its own and served important government interests, it

concluded that "the layering of two types of prophylactic

measures [was] substantially broader than necessary to achieve

those interests." *Id.* at 279 (internal quotation omitted).  The

Third Circuit therefore instructed the City of Pittsburgh to

---

[14] The State Attorney General issued a guidance explaining how these
exemptions would be applied. *See McCullen I*, 571 F.3d at 184.  In
*McGuire I* and *McCullen I*, the Court rejected the notion that the
exemptions rendered the statute content-based.  Because the Court
could envision at least one legitimate, content-neutral reason for
including the employee exception in the act—namely, the possibility
that a clinic agents and employees may assist in ensuring patients'
safe passage and access to RHCFs—the First Circuit rejected the
demonstrators' argument that the law impermissibly discriminated on
the basis of content or viewpoint. *See McCullen I*, 571 F.3d at 177;
*McGuire I*, 260 F.3d at 45-47.

choose the provision it wanted to enforce and directed the
district court to enjoin enforcement of the other.

Finally, in *Hoye v. City of Oakland*, 653 F.3d 835, 859 (9th
Cir. 2011), the Ninth Circuit upheld the facial
constitutionality of an Oakland Ordinance establishing a
floating buffer zone that was also similar to the Colorado
statute in *Hill*; however, the as-applied challenge was a
different matter.  After the City admitted that it had a "policy
of distinguishing between speech that facilitates access to
clinics and speech that discourages access to clinics," *id.* at
851, the Ninth Circuit applied strict scrutiny and invalidated
the enforcement policy.  *Id.* at 853-54.

## II.  Recent First Amendment Jurisprudence

The Plaintiffs argue that five major First Amendment cases
decided in the last few years undermine the force of the buffer
zone cases preceding them.  *See Brown v. Entm't Merchants Ass'n*,
131 S. Ct. 2729 (2011) (invalidating a statute imposing
restrictions and labeling requirements on the sale of violent
video games); *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653
(2011) (holding that a statute restricting the sale, disclosure
and use of pharmacy records to marketers was impermissibly
content-based); *Snyder v. Phelps*, 131 S. Ct. 1207 (2011)
(holding that the First Amendment shielded protesters from tort
liability for picketing at a soldier's funeral); *United States*

33

*v. Stevens*, 130 S. Ct. 1577 (2010) (striking down a federal statute prohibiting the creation, sale, or possession of portrayals of animal cruelty); *Citizens United v. Federal Election Com'n*, 558 U.S. 310 (2010) (striking down a federal campaign statute banning corporations from engaging in political speech).

These cases do not carry the weight Plaintiffs assign them. First, they all involve restrictions on speech that were expressly content or viewpoint-based. In *Sorrell*, for example, the Court found that "the express purpose and practical effect" of Vermont's statute banning the sale or dissemination of prescriber-identifying information was "to diminish the effectiveness of marketing by manufacturers of brand-name drugs." 131 S. Ct. at 2663. In *Brown* and *Stevens*, the content-based nature of the statutes was even more obvious, as the regulations in those cases placed restrictions on depictions of animal cruelty and violent video games. *Brown*, 131 S. Ct. at 2733 (striking down a California statute prohibiting the sale or rental of "violent video games" to minors); *Stevens*, 130 S. Ct. at 1582 (striking down a federal statute establishing a criminal penalty for anyone who knowingly "'creates, sells, or possesses a depiction of animal cruelty,'" if done "'for commercial gain'" in interstate or foreign commerce) (quoting 18 U.S.C. § 48(a)).

*Citizens United* is perhaps slightly more relevant to Plaintiffs' position, but they rely on it for the broad proposition that the government cannot issue "restrictions distinguishing among different speakers, allowing speech by some but not by others." 130 S. Ct. at 898. In doing so, Plaintiffs overlook the obvious differences between a regulation that prohibits a particular class of speakers (corporations) from engaging in speech with a particular content (electioneering communication) and one that restricts the locations where patrolling, picketing, demonstrating, or congregating may occur. *Accord McCullen v. Coakley*, 759 F. Supp. 2d 133, 137 (D. Mass. 2010) (rejecting the notion that time-place-manner restrictions are analyzed differently after *Citizens United*). The notion that *Citizens United* signified a sea-change in the treatment of time-place-manner restrictions is also firmly dispelled by *Snyder*. Although the Court determined that protesters at a soldier's funeral could not be subject to tort damages for their First Amendment activity, the Court reaffirmed the principle that "[protesters'] choice of where and when to conduct [their] picketing is not beyond the Government's regulatory reach—it is 'subject to reasonable time, place, or manner restrictions' that are consistent with the standards announced in this Court's precedents." 131 S. Ct. at 1218 (quoting *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). The Court

noted that there were several "situations where the location of targeted picketing can be regulated under provisions that the Court has determined to be content-neutral" and cited the fixed buffer zone upheld in *Madsen* with approval. *Snyder*, 131 S. Ct. at 1218.

*     *     *

Having laid out the precedents guiding this opinion, the Court first addresses the City's motion to dismiss the Plaintiffs' facial challenges and then turns to the Plaintiffs' motion for a preliminary injunction.

### III. The Motion to Dismiss the Facial Challenges to the Ordinance

The City moves to dismiss Plaintiffs' facial challenges on the grounds that they fail to state a claim on which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)), and a facial challenge that is deficient as a matter of law may be dismissed. *See Kittay v. Giuliani*, 252 F.3d 645, 646-47 (2d Cir. 2001) (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see also Cook v. Gates*, 528 F.3d 42, 65 (1st Cir. 2008) (affirming a district court's dismissal of facial challenges to the "Don't Ask, Don't Tell" statute). A party advancing a

36

facial challenge carries a heavy burden, for it "must fail where the statute has 'a plainly legitimate sweep.'" *Wash. State Grange*, 552 U.S. at 449 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 739-40 & n.7 (1997) (Stevens, J., concurring)). In considering a facial challenge, the Court looks "only [to] the text of the statute itself, not its application to the particular circumstances of an individual." *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006) (citing *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 770 n.11 (1988); *see also Wash. State Grange*, 521 U.S. at 449-50 ("In determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases.").

### A. Time, Place, and Manner Restriction

Following the example of previous buffer-zone cases, the Court applies intermediate scrutiny. *See, e.g. Hill*, 530 U.S. at 719, 725; *McCullen I*, 571 F.3d at 175. "Content neutral time, place and manner regulations must be narrowly tailored to serve a significant government interest, and must leave open ample alternative channels of communication." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 341 (2d Cir. 2010) (internal quotation marks omitted). On its face, the Ordinance meets each of these requirements.

### 1.  Content (and Viewpoint[15]) Neutrality

"As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or view expressed are content-based." *Turner Broad. Sys.*, 512 U.S. at 643.  The Supreme Court has further explained that "the principal inquiry in determining the content neutrality, in speech cases generally, and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward*, 491 U.S. at 791; *see also Hill*, 530 U.S. at 719 (applying *Ward*).  "Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.'" *Ward*, 491 U.S. at 791 (quoting *Clark*, 468 U.S. at 293).  A regulation is not content-based simply because it disproportionately burdens certain speakers or has an incidental effect on some and not others. *McGuire I*, 260 F.3d at 44 (citing *Hill*, 530 U.S. at 719; *Ward*, 491 U.S. at 791).

On its face, the Ordinance is content-neutral.  The Council's findings contained in the Ordinance state that its goals are to ensure public safety and order while balancing First Amendment freedoms with the right of individuals to seek

---

[15] Because of the substantial overlap between the Plaintiffs' argument that the Ordinance restricts speech on the basis of content and viewpoint, the Court addresses both claims in this section.

reproductive health care services. BCO § 21-111. The
Plaintiffs argue that the Court need not consider those
objectives because they are merely pretext, but this argument
fails for several reasons. On a facial challenge, the Court
looks only to "the text of the statute itself, not to the
particular circumstances of an individual." *Field* Day, 463 F.3d
at 174. By definition, an argument grounded in pretext requires
the Court to look beyond the text and is therefore inappropriate
in the context of a facial challenge; the Court must take the
Council's findings at face value.[16] *Cf. United States v.
O'Brien*, 391 U.S. 367, 383 (1968) ("It is a familiar principle
of constitutional law that this Court will not strike down an
otherwise constitutional statute on the basis of an alleged
illicit legislative motive.").

To the extent that Plaintiffs are arguing that the
objectives mentioned in section 21-111 are fully addressed by
the *unchallenged* provision prohibiting anyone from obstructing
access to RHCFs, section 21-113(1), the Court has several
responses: First, this argument essentially recasts an
objection to the necessity of the buffer zone—*i.e.* a reason why
the buffer zone might not be narrowly tailored—as a reason for

---

[16] For this reason, Plaintiffs' allegations that Planned Parenthood and
other pro-choice advocates were "undoubtedly" responsible for the
passage of the Ordinance has no bearing on the question of whether the
Ordinance is a facially valid time-place-manner restriction.

doubting its content neutrality.  In this respect, Plaintiffs

conflate two components of the time-place-manner standard.

Second, Plaintiffs ignore the fact that the Supreme Court has

condoned the use of buffer zones and other "prophylactic"

measures in cases where there were also direct prohibitions on

obstructing access to medical facilities.[17]  *See Hill*, 530 U.S.

at 707 n.1; *Madsen*, 512 U.S. at 759-60.  Accordingly, the Court

finds the City's choice to supplement a direct prohibition with

a buffer zone largely irrelevant to the question of whether the

Ordinance is content-neutral.

Of far greater significance is the fact that the actual

language of the Ordinance is neutral with respect to the content

and viewpoint of the speech it regulates.  The terms

"congregate", "patrol", "picket", and "demonstrate" identify the

ways in which an individual is expressing herself, but they do

not favor one subject matter or viewpoint over another.  That

the Ordinance may at times require law enforcement to examine an

individual's speech to determine whether she is congregating,

patrolling, picketing, or demonstrating does not make it a

---

[17] Under the Plaintiffs' logic, all state and local measures protecting
RHCFs might be considered duplicative (and therefore impermissible)
due to the fact that there is a federal statute creating civil and
criminal penalties for any person who "by force or threat of force or
by physical obstruction, intentionally injures, intimidates or
interferes with . . . any person because that person is or has been,
or in order to intimidate such person or any other person or any class
of persons from, obtaining or providing reproductive health services."
18 U.S.C. § 248(a)(1).

content-based regulation for the purposes of the First

Amendment.  As the Supreme Court explained in *Hill*,

> It is common in the law to examine the content of a
> communication to determine the speaker's purpose.  Whether
> a particular statement constitutes a threat, blackmail, an
> agreement to fix prices, a copyright violation, a public
> offering of securities, or an offer to sell goods often
> depends on the precise content of the statement.  *We have
> never held, or suggested, that it is improper to look at
> the content of an oral or written statement in order to
> determine whether a rule of law applies to a course of
> conduct.*  With respect to the conduct that is the focus of
> the Colorado statute, it is unlikely that there would often
> be any need to know exactly what words were spoken in order
> to determine whether "sidewalk counselors" are engaging in
> "oral protest, education, or counseling" rather than pure
> social or random conversation.
>
> Theoretically, of course, cases may arise in which it is
> necessary to review the content of the statements made by a
> person approaching within eight feet of an unwilling
> listener to determine whether the approach is covered by
> the statute.  But that review need be no more extensive
> than a determination whether a general prohibition of
> "picketing" or "demonstrating" applies to innocuous speech.
> The regulation of such expressive activities, by
> definition, does not cover social, random, or other
> everyday communications.  *See* Webster's Third New
> International Dictionary 600, 1710 (1993) (defining
> "demonstrate" as "to make a public display of sentiment for
> or against a person or cause" and "picket" as an effort "to
> persuade or otherwise influence").  Nevertheless, *we have
> never suggested that the kind of cursory examination that
> might be required to exclude casual conversation from the
> coverage of a regulation of picketing would be problematic.*

530 U.S. at 721-22 (emphasis added).  The Court's insight can be

restated rather succinctly: a regulation is not content-based

simply because an enforcing officer might have to consider what

an individual is saying to determine whether she is expressing

herself in the manner proscribed.

The other provisions in the Ordinance are also content-neutral.  The term "reproductive health care facility" includes any facility where "legally authorized persons provide health care services or health care counseling relating to the human reproductive system."  BCO § 21-112.  It is certainly true that demonstrations in the vicinity of a *reproductive* health care facility are more likely to feature certain content than, say, demonstrations near a pediatrician's office; however, the mere fact that the Ordinance will disproportionately burden individuals protesting for or against a particular procedure is insufficient to render it content-based.  *See Hill*, 530 U.S. at 724 (rejecting as "flawed" the "theory that a statute restricting speech becomes unconstitutionally content based because of its application to the specific locations where that discourse occurs") (quotation omitted); *Hoye*, 653 F.3d at 846 ("[N]either the fact that the Ordinance applies only to speech outside reproductive health care facilities, not hospitals generally, nor the fact that it protects only those 'seeking to enter' the facilities renders it content-based."); *McGuire I*, 260 F.3d at 44 ("Although the Act clearly affects anti-abortion protesters more than other groups, there is no principled basis for assuming that this differential treatment results from a fundamental disagreement with the content of their expression.").  In fact, as it is defined in the Ordinance, the

term RHCF does not discriminate between facilities that provide particular services such as abortion or contraception and those that do not.[18]

Similarly, the exemption of RHCF employees and agents acting within the scope of their employment does not render the Ordinance content or viewpoint-based. The exemption identifies individuals by virtue of their association with an RHCF rather than the content or viewpoint of their speech, and it is again significant that the particular RHCF that employs them is protected by the buffer zone regardless of whether it has adopted a pro-choice or pro-life viewpoint. Furthermore, the exemption is limited in significant respects: First, it applies *only* to "*employees or agents* of an RHCF", not to all individuals sharing the viewpoint held by that RHCF. BCO § 21-113 (emphasis added). Second, it only applies when those agents and employees are "acting *within the scope of their employment*." *Id.* (emphasis added). The Ordinance therefore applies to an RHCF employee or agent who, by congregating, picketing, patrolling, or demonstrating, is not acting within the scope of her employment.

As other courts have noted, there are also rational, non-discriminatory reasons for including the agent or employee

---

[18] The question of whether a provision restricting speech near "all facilities that provide abortions" is not presented in this case, so there is no need to answer it.

exception.  The City "could have concluded that clinic employees are less likely to engage in directing of unwanted speech toward captive listeners—a datum that the *Hill* Court recognized as justifying the statute there." *McGuire I*, 260 F.3d at 46 (citing *Hill*, 530 U.S. at 715-17); *see also McCullen I*, 571 F.3d at 178 ("[T]he exception for persons associated with RHCFs remains reasonably related to the legislature's legitimate public safety objectives.  No more is exigible to reject this aspect of the plaintiffs' facial challenge.").  "[W]here differential treatment is justified, on an objective basis, by the government's content-neutral effort to combat secondary effects [of certain speech], it is insufficient that a regulation may have been adopted in direct response to the negative impact of a particular form of speech." *McGuire I*, 260 F.3d at 45 (citing *Hill*, 530 U.S. at 723; *Madsen*, 512 U.S. at 762-64).  Even if the Court assumed that the Ordinance would affect anti-abortion protesters more than other groups, it would still be permissible as written.

### 2.  Significant Governmental Interests

On its face, the Ordinance also serves significant governmental interests.  In *Schenck*, the Supreme Court explained that the interests of "ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to

seek pregnancy-related services" were, in combination, "significant enough to justify an appropriately tailored injunction to secure unimpeded physical access to the clinics." 519 U.S. at 376; *see also Hill*, 530 U.S. at 715 (citing similar interests to uphold a buffer zone created by statute); *Operation Rescue Nat'l*, 273 F.3d at 202 (recognizing that ensuring public safety and order, protecting freedom to receive reproductive health services, advancing medical privacy and the well-being of patients seeking care at facilities, and safeguarding private property are significant governmental interests).  Section 21-111 of the Ordinance repeats these interests almost verbatim.

Facing an uphill battle in light of those precedents, the Plaintiffs retreat to a familiar refrain: pretext.  They argue that because section 21-113(1), the direct prohibition on blocking access to RHCFs, accomplishes the purposes of the Ordinance, the real motivation behind section 21-113(2) "must be more sinister."[19]  *See* Pls.' Mem. at *28, ECF No. 9.  In support of this theory, the Plaintiffs marshal statements of several officials, including the Assistant to the Mayor, who asserted that "the intent of the ordinance was so that people entering RHCFs did not have to face demonstrators or be bothered."  Pls.'

_____

[19] The petitioners in *Schenck* made similar arguments with respect to an unchallenged portion of the injunction in that case; however, the Court rejected them and deferred to the lower court's judgment that a ban on impeding entry and exit to a facility was insufficient.  519 U.S. at 381-82.  The Court affords similar respect to the Council's judgment here.

Ex. 11.  By relying on post-hoc assessments of the Council's intent by City officials, Plaintiffs again ask the Court to look beyond the face of the statute and speculate about the Council's subjective intent, which is "both unknown and unknowable." *McGuire I*, 260 F.3d at 47.[20]

Were the Court to look past that defect in Plaintiffs' argument, it would find another.  While the First Amendment generally protects the "right to communicate freely with one's fellow citizens and with the government on issues of public importance," *Eastern Conn. Citizens Action Grp. v. Powers*, 723 F.2d 1050, 1051 (2d Cir. 1983), governments may balance freedom of expression with the need "to protect those who seek medical treatment from the potential physical and emotional harm suffered when an unwelcome individual delivers a message (whatever its content) by physically approaching at close range."  *Hill*, 530 U.S. at 718 n.25.  Thus, the City may take more significant steps to restrict unwelcome speech directed at individuals seeking medical care than it can when the speech is directed at members of the general public.

### 3.  Narrow Tailoring

---

[20] During the hearing, Plaintiffs' counsel repeatedly suggested that this Court could consider "to some degree, . . . the *interpretation of the statute given by those charged with enforcing it*."  *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 186 (2d Cir. 2010) (quoting *Grayned,* 408 U.S. at 110) (emphasis added).  But counsel overlooked the fact that the Second Circuit was explaining what information was relevant to a *vagueness* challenge.

"[A] regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests . . . ."; however, the regulation "need not be the least restrictive or least intrusive means of doing so." *Ward*, 491 U.S. at 798; *see also Hill*, 530 U.S. at 726 ("As we have emphasized on more than one occasion, when a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal.").[21]  Instead, a regulation is narrowly tailored if it "'*promotes a substantial government interest that would be achieved less effectively absent the regulation*,'" *Ward*, 491 U.S. at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)) (emphasis added),

---

[21] In cases involving injunctions, the Supreme Court and the Second Circuit have applied a more exacting standard by requiring "no greater restriction than necessary" to effect substantial governmental interests.  *See Madsen*, 512 U.S. at 764 ("If this were a content-neutral, generally applicable statute, instead of an injunctive order, its constitutionality would be assessed under the standard set forth in *Ward*. . . ."); *Schenck*, 519 U.S. at 372, 374 (applying *Madsen*); *Operation Rescue Nat'l*, 273 F.3d at 203 (same); *Scott*, 187 F.3d at 287 (same).  Statutes and ordinances are subject to slightly less scrutiny because their comprehensiveness and general applicability is "evidence against there being a discriminatory motive." *Hill*, 530 U.S. at 731 (2000) ("As Justice Jackson observed, 'there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon the minority must be imposed generally.'") (quoting *Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 112 (1949) (concurring opinion)); *see also McCullen I*, 571 F.3d at 178-70 ("[T]he [Supreme] Court has made it pellucid that the absence of general applicability subjects injunctions to a stricter standard than legislative enactments.").

and does so without burdening "substantially more speech than necessary." *Id.* For this reason, "'a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted' are not conditions precedent to upholding a time-place-manner restriction." *McCullen I*, 571 F.3d at 179 (quoting *Ward*, 491 U.S. at 800) (internal quotation omitted).

While there is "no outer limit" on the size of a buffer zone, the 36 and 15-foot dimensions upheld in *Madsen,* 512 U.S. at 769-70, and *Schenck*, 519 U.S. at 381, serve as benchmarks for what is permissible. *Operation Rescue Nat'l*, 273 F.3d at 204. Because of the inherent difficulty of establishing buffer zones that are perfectly calibrated to the circumstances of each facility, courts must afford some deference to the body responsible for crafting them. *See Hill*, 530 U.S. at 729 (noting "the great difficulty of protecting, say, a pregnant woman from physical harassment with legal rules that focus exclusively on the individual impact of each instance of behavior . . ."); *Schenck*, 519 U.S. at 381 ("Although one might quibble about whether 15 feet is too great or too small a distance if the goal is to ensure access, we defer to the District Court's reasonable assessment of the number of feet necessary to keep the entrances clear."); *Madsen*, 512 U.S. at

769-70 ("The need for a complete buffer zone near the clinic entrances and driveway may be debatable, but some deference must be given to the state court's familiarity with the facts and the background of the dispute between the parties even under our heightened review."). "A bright-line prophylactic rule," the Supreme Court has reasoned, "may be the best way to provide protection, and, at the same time, by offering clear guidance and avoiding subjectivity, to protect speech itself." *Hill*, 530 U.S. at 729.

The Plaintiffs point to language in *Hill* indicating the Supreme Court's concern with the ability of protesters to "communicate at a normal conversational distance" and to distribute handbills to unwilling recipients, 530 U.S. at 727-28; however, the Court has never held that either form of expression is guaranteed by the First Amendment. The Plaintiffs also contend that the Ordinance is more suspect than the statute at issue in *Hill* because the Ordinance applies to willing listeners as well as unwilling ones and because the Ordinance regulates all expressive activity, not merely the display of signs, leafleting, and oral speech. While these distinctions are real, they ignore a much more important difference between the two cases: the Ordinance establishes *fixed* buffer zones, whereas the statute in *Hill* creates floating ones. *See Schenck*, 519 U.S. at 377-385 (upholding a fixed buffer zone of 15 feet

49

while striking down a floating buffer zone of the same size in part because of the uncertainty protesters would face in knowing where the floating buffer zones were in effect). The most important inference one can draw from *Hill*, *Schenck*, and *Madsen* is that floating buffer zones are inherently more suspect than fixed ones because of the greater potential for uncertainty as to where certain speech is permitted. *See, e.g. Schenck*, 519 U.S. at 378 ("[I]t would be quite difficult for a protester who wishes to engage in peaceful expressive activities to know how to remain in compliance with the injunction. This lack of certainty leads to a substantial risk that much more speech will be burdened than the injunction by its terms prohibits."). Although the Supreme Court in *Hill* emphasized the ability of protesters to engage individuals at normal conversational distance and expressed concern about their ability to distribute handbills, those concerns received far less prominence in the portions of *Schenck* or *Madsen* addressing the validity of fixed buffer zones. For this reason, the fact that the statute in *Hill* was framed more narrowly than the Ordinance at issue here is hardly as significant as Plaintiffs suggest.

On its face, the City's 35-foot buffer zone is narrowly tailored. The City's interests in ensuring public safety and order, promoting the free flow of traffic, protecting First Amendment freedoms, and ensuring access to reproductive health

care services would be less effectively served without the regulation.  *Accord McCullen I*, 571 F.3d at 178 (citing *Ward*, 491 U.S. at 799).  The Ordinance creates buffer zones that are very similar to those upheld in *Madsen*, 512 U.S. at 768-71 (36 feet), and *McCullen I*, 571 F.3d at 178-80 (35 feet).  The Ordinance also does not burden substantially more speech than necessary.  The fact that the Ordinance punishes only individuals who "*knowingly* congregate, patrol, picket, or demonstrate in the Buffer Zone" prevents its application to individuals who are inadvertently too close to an RHCF.[22]  *See Hill*, 530 U.S. at 727 (relying in part on the "knowing" requirement to uphold an 8-foot floating buffer zone).  Even if this Court were to agree with Plaintiffs that the most appropriate restriction would include a narrower definition of RHCFs and would not be applicable 24 hours a day, the Court's role is not to insist on the least restrictive restriction that Plaintiffs can imagine; rather it is to determine whether Burlington's valid governmental interests burden substantially more speech than necessary.  In the Court's view, it does not.

---

[22] This feature of the Ordinance also militates against Plaintiffs' argument that the failure of the City to include a notification requirement precludes it from being narrowly tailored.  Because of the scienter requirement, protesters are only subject to the Ordinance when they are aware that they are protesting within 35 feet of an RHCF.  As a consequence, an individual would be unlikely to be charged under the Ordinance unless he or she was made aware of the buffer zone by some sort of posted notice or a prior warning by an enforcing officer.

## 4. Alternative Avenues of Communication

The final requirement for time-place-manner restrictions is that they must leave open ample alternative channels for communication; however, this requirement "'does not guarantee [protesters] access to every or even the best channels or locations for their expression.'" *Marcavage v. City of New York*, 689 F.3d 98, 107 (2d Cir. 2012) (quoting *Carew–Reid v. Metro. Transp. Auth.*, 903 F.2d 914, 919 (2d Cir. 1990)). Although these alternatives need not be perfect substitutes for the channels of communication denied to Plaintiffs, *see Costello v. City of Burlington*, 632 F.3d 41, 47 (2d Cir. 2011) (citing *Mastrovincenzo v. City of New York*, 435 F.3d 78, 101 (2d Cir. 2006)), Plaintiffs ability to communicate with their intended audience cannot be completely foreclosed. *See City of Ladue v. Gilleo*, 512 U.S. 43, 57 (1994) ("[A] person who puts up a sign at her residence often intends to reach neighbors, an audience that could not be reached nearly as well by other means."); *see also Gresham v. Peterson*, 225 F.3d 899, 906-07 (7th Cir. 2000); *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229 (9th Cir. 1990). Here, Plaintiffs' core complaint is that the buffer zone prevents them from engaging in close, personal contact with their target audience—"pregnant women who may be on the verge of a potentially unnecessary abortion." Pls.' Mem. at *33, ECF No. 9. In the Plaintiffs' experience, being able to make eye

contact with these individuals and talk to them in a kind,
gentle voice is the most effective way to convey their message,
while shouting from across the street or using loudspeakers is
generally counterproductive because it makes the Plaintiffs
appear more aggressive or hostile than they would like.

Though the Court appreciates the Plaintiffs' understandable
wish to engage with RHCF patrons on a personal level, the First
Amendment does not guarantee them an unqualified right to do so.
The City is entitled to protect individuals seeking to enter
health care facilities "from unwanted encounters,
confrontations, and even assaults by enacting an exceedingly
modest restriction on the speakers' ability to approach." *Hill*,
530 U.S. at 729.  Because such individuals "are often in
particularly vulnerable physical and emotional conditions," the
City is justified in adopting prophylactic measures that "will
sometimes inhibit a demonstrator whose approach would have
proved harmless." *Id*.  Moreover, without getting into the
specific details of the Planned Parenthood (or any other)
facility, a separation of 35 feet between protesters and their
target audience does not impermissibly foreclose all
communications between the parties.  They may engage in all
sorts of expressive activities, including prayer, song,
leafleting, holding up signs, and offering advice to passers-by;
and they can converse with anyone who leaves the buffer zone to

speak with them.  The Ordinance places absolutely no burdens on those activities, which can in any event be heard and seen from inside the zone.  *Accord McCullen I*, 571 F.3d at 180.

*          *          *

Because the Ordinance is content-neutral, narrowly tailored to advance significant governmental interests, and leaves open ample alternative channels of communication, on its face it is a valid time-place-manner regulation.

### B.    Overbreadth[23]

Litigants challenging a regulation under the First Amendment may assert that it is overbroad even when the challengers' own free speech rights are not implicated.  *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).  "In such cases, it has been the judgment of [the Supreme] Court that the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted and perceived grievances left to fester because of the possible inhibitory effects of overly broad statutes."  *Id.*  Nonetheless, facial overbreadth challenges are "an exception to our traditional rules of practice"; for that reason, "the overbreadth of a statute must

---

[23] In the Second Circuit, "[a]ll overbreadth challenges are facial challenges."  *Farrell v. Burke*, 449 F.3d 470, 498 (2d Cir. 2006). Whether the same is true in other circuits is unclear.  *See McCullen II*, 2013 WL 85928 at *9 (recognizing a split between *Farrell* and *Turchick v. United States*, 561 F.2d 719, 721 n.3 (8th Cir. 1977), which suggests that as-applied overbreadth challenges do exist).

54

not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id.* at 615; *see also McCullen I*, 571 F.3d at 182 ("'[T]he overbreadth doctrine is strong medicine that is used sparingly and only as a last resort.'") (quoting *N.Y. State Club Ass'n v. City of New York,* 487 U.S. 1, 15 (1988)).

The Court must first construe the Ordinance and determine whether it criminalizes a substantial amount of protected expressive activity. *United States v. Williams*, 553 U.S. 285, 293-302 (2008). Plaintiffs advance a construction of the Ordinance that essentially transforms one of its exemptions into its rule. As the buffer zone is inapplicable to "people using the public sidewalk or street right-of-way adjacent to [an RHCF] *solely* for the purpose of reaching a destination other than such a facility," BCO § 21-113(2)(a)(4) (emphasis added), Plaintiffs suggest that the Ordinance bans individuals from standing in or utilizing the zones for any and all purposes other than reaching a destination other than such facility. But this ignores the basic structure of the Ordinance. An individual must "knowingly congregate, patrol, picket or demonstrate in the Buffer Zone" for the Ordinance to apply in the first place. BCO § 21-113(2). A wide range of activities is therefore unaffected by the Ordinance, even before the exemptions are considered. The Ordinance does not prohibit commercial advertisements,

charitable solicitations, or forms of public entertainment (providing, of course, that the individual engaging in those acts is not also congregating, patrolling, picketing, or demonstrating).  In the Court's view, the exemption does not redefine the prohibition; rather, it simply removes any doubt that the Ordinance might apply to individuals who are using the public sidewalks to reach a destination other than the RHCF.

Plaintiffs may be able to identify examples of particular activities that are unnecessarily prohibited by the Ordinance[24]; however, those examples are heavily outweighed by the circumstances in which it has a plainly legitimate sweep.  The Ordinance is limited to reproductive health care facilities and carves out a relatively small portion of public space around those facilities where four forms of expression are prohibited. It is of course possible that the City could have imposed a narrower restriction, but it might have risked the content or viewpoint neutrality of the Ordinance if it had.  The standard is not so exacting that it requires legislative bodies to "choose between passing laws that were not content-neutral or laws that were overbroad." *McCullen I*, 571 F.3d at 182.  For that reason, the mere "fact that the coverage of [the Ordinance]

---

[24] The use of the term "congregate" seems most egregious in this respect because it may cover more activity than is necessary to accomplish the objectives of the Ordinance; however, it is not difficult to envision circumstances in which the congregation of several individuals could impede access to an RHCF.

is broader than the specific concern that led to its enactment is of no constitutional significance," *Hill*, 530 U.S. at 730-31, and Plaintiffs' overbreadth challenge also fails.

## C. Vagueness

"A facial vagueness challenge . . . will succeed only on a showing that the law 'is impermissibly vague in all of its applications.'" *Vt. Right to Life Comm., Inc. v. Sorrell*, 875 F. Supp. 2d 376, 386-87 (D. Vt. 2012) (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 495 (1982)). A statute can be impermissibly vague for two independent reasons: "First if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at 732 (citing *Chicago v. Morales*, 527 U.S. 41, 56-57 (1999)); *see also Cunney v. Bd. of Trs. of Grand View*, 660 F.3d 612, 620 (2d Cir. 2011). In other words, a regulation must give individuals sufficient notice of what conduct is proscribed, *see Cunney*, 660 F.3d at 621 ("The relevant inquiry under the first vagueness ground is 'whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices.'") (quoting *Rubin v. Garvin*, 544 F.3d 461, 466 (2d Cir. 2008)), and it must also be sufficiently

definite to prevent its arbitrary enforcement.  *See Farrell v. Burke*, 449 F.3d 470, 494 (2d Cir. 2006).

The first of these concerns is addressed by the fact that the Ordinance contains a scienter requirement.  *See Hill*, 530 U.S. at 732.  Because the Ordinance only applies to those who "knowingly congregate, patrol, picket, or demonstrate within the Buffer Zone" and it is unlikely that anyone would not understand those common words, the Ordinance affords people of ordinary intelligence an opportunity to understand what it prohibits.  *Id.*  Plaintiffs nonetheless argue that the Ordinance is capable of arbitrary enforcement for three reasons: (1) the Ordinance fails to define the terms "congregate, patrol, picket, or demonstrate"; (2) the exception for "persons using the public sidewalk or street . . . *solely* for the purpose of reaching a destination other than [an RHCF]" implies that more conduct is prohibited than simply congregating, patrolling, picketing or demonstrating; and (3) the City does not require buffer zones to be posted or marked.  BCO § 21-113(2) (emphasis added).

None of these features render the Ordinance constitutionally suspect.  First, the terms "congregate, patrol, picket, and demonstrate" are sufficiently concrete to prevent arbitrary enforcement.  Because "we can never expect mathematical certainty from our language," an ordinance "marked by flexibility and reasonable breadth, rather than meticulous

specificity" may survive a vagueness challenge. *Grayned,* 408

U.S. at 110. The fact that the Ordinance "has some grey in it"

and will require officers to determine whether certain

activities are "demonstrations" do not make it constitutionally

deficient. Pls.' Ex. 11. The Supreme Court has rejected

vagueness challenges to identical language. *See Schenck*, 519

U.S. at 383 (demonstrating); *Madsen*, 512 U.S. at 775-76

(congregating, picketing, patrolling, and demonstrating). And

while all four terms are certainly subject to some

interpretation, the common understanding of each is reasonably

concrete.[25]

Nor is the use of the term "solely" to define one of the

exceptions to the Ordinance inherently vague or contradictory.

As explained above, the exemption makes absolutely clear that

the Ordinance does not prohibit a person from using the public

sidewalk or street solely for the purpose of reaching an

establishment other than the RHCF. That such an individual

would not fall within the statute's proscription of

---

[25] Merriam-Webster's Collegiate Dictionary, 10th ed., provides the
following definitions: To "congregate" is "to come together into a
group, crowd, or assembly." *Id*. at 243. To "patrol" means "to carry
out a patrol," which is "the action of traversing a district or beat
or of going the rounds along a chain of guards for observation or the
maintenance of security." *Id*. at 850. To "picket" is to "walk or
stand in front of as a picket," i.e. "a person posted by a labor
organization at a place of work affected by a strike." *Id*. at 876.
Finally, the intransitive verb, "to demonstrate" means to make a
demonstration, including "an outward expression or display" or "a
public display of group feelings toward a person or cause." *Id*. at
301.

congregating, patrolling, picketing, and demonstrating in the first place is perhaps slightly redundant, but it does not make the Ordinance impermissibly vague.

Finally, the City's failure to include a signage requirement is of little consequence. Once again, the scienter requirement bears mentioning: the Ordinance only applies to persons who "*knowingly* congregate, patrol, picket or demonstrate in the Buffer Zone." BCO § 21-113 (emphasis added). An individual unaware that he or she is demonstrating in the Buffer Zone is not subject to the civil penalty created by the Ordinance. In practice, enforcement of the buffer zone may therefore require some sort of signage or marking, as the City has done on St. Paul Street, or a verbal warning from an officer indicating that an individual is engaging in proscribed activities within a buffer zone. But the City's decision not to include these requirements in the text of the Ordinance does not make it unconstitutionally vague.

*        *        *

Because the Plaintiffs' facial challenges do not state a claim upon which relief can be granted, this Court **grants** Defendants' motion to dismiss.

## IV. The Plaintiffs' Motion for a Preliminary Injunction

Parties seeking a preliminary injunction must demonstrate that they will suffer irreparable harm absent injunctive relief

and either (1) that they are "likely to succeed on the merits of the action," or (2) that there are "sufficiently serious questions going to the merits to make them a fair ground for litigation, provided that the balance of hardships tips decidedly in favor of the moving party." *Mullins v. City of New York*, 626 F.3d 47, 52-53 (2d Cir. 2010) (citing *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34-35 (2d Cir. 2010)). "However, when a party seeks an injunction that will affect governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the plaintiff must typically show a likelihood of success on the merits—a serious question going to the merits is usually insufficient, even if the balance of hardships tips decidedly in the applicant's favor." *Mullins*, 623 F.3d at 53 (citing *Monserrate v. N.Y. State Senate*, 599 F.3d 148, 154 (2d Cir. 2010)); *see also Bronx Household of Faith v. Bd. of Educ. of City of New York*, 331 F.3d 342, 349 (2d Cir. 2003) ("Where the requested preliminary injunction would stay government action taken in the public interest pursuant to a statutory or regulatory scheme—as it does here—the less rigorous burden of proof standard envisioned by the phrase 'fair ground for litigation' does not apply, and instead the party seeking injunctive relief must satisfy the more rigorous prong of 'likelihood of success.'"). In addition, the moving party must

show that a preliminary injunction is in the public interest.
*Oneida Nation of New York v. Cuomo*, 645 F.3d 154, 164 (2d Cir.
2011).

The City argues that the Plaintiffs cannot demonstrate a
likelihood of success on the merits. Because this Court is
dismissing Plaintiffs' facial claims, the Plaintiffs must show
that they are likely to succeed on their as-applied claims to
obtain a preliminary injunction.

## A.    The Likelihood of Success of Plaintiffs' As-Applied Challenges

Plaintiffs' as-applied challenges require consideration of
the impact the Ordinance has had at individual RHCFs in addition
to the manner of its enforcement. *See Field Day*, 463 F.3d at
174. Nonetheless, the Court incorporates its discussion of the
facial challenges to the extent that the Plaintiffs' as-applied
challenges rely on the same arguments the Court has already
dismissed. *See, e.g. McCullen II*, 2013 WL 85928 at *10 ("[A]
plaintiff cannot rewardingly prosecute an as-applied challenge
to the constitutionality of a statute based on the same legal
arguments and factual predicate that underpinned an earlier
(unsuccessful) facial challenge.").

### 1.    Viewpoint Discrimination[26]

---

[26] As the First Circuit explained in *McGuire II*, a claim of viewpoint
discrimination in violation of the First Amendment is distinct from a
selective enforcement claim under the Equal Protection Clause of the

"Local governing bodies . . . can be sued directly under
§ 1983 for monetary, declaratory, or injunctive relief where . .
. the action that is alleged to be unconstitutional implements
or executes a policy statement, ordinance, regulation, or
decision officially adopted and promulgated by that body's
officers." *Monell v. Dep't of Soc. Servs. of City of New York*,
436 U.S. 658, 690 (1978).  A municipality is thus liable for
both its articulated policies and its custom of enforcing;
however "[p]roof of a single incident of unconstitutional
activity is not sufficient to impose liability under *Monell*,
unless proof of the incident includes proof that it was caused
by an existing, unconstitutional municipal policy, which policy
can be attributed to a municipal policymaker. *City of Oklahoma
City v. Tuttle*, 471 U.S. 808, 823-24 (1985).  "[T]o win a
viewpoint discrimination enforcement challenge against a law
that is facially neutral, the challenge would need to show 'a
pattern of unlawful favoritism.'" *McGuire II*, 386 F.3d at 64
(quoting *Thomas v. Chicago Park District*, 534 U.S. 316, 325
(2002)).

---

Fourteenth Amendment.  *See* 386 F.3d at 63 ("The primary potential
difference concerns the role of intent: in equal protection cases,
plaintiffs must show that the relevant government actor intended to
discriminate against the disfavored group.").  Whereas in the equal
protection context, "courts have been loathe to infer intent from mere
effect," a claim of viewpoint discrimination may be proven by
demonstrating a pattern of unlawful favoritism.  *Id.* at 63-64.  In
both written and oral representations to the Court, Plaintiffs have
clarified that they are raising a viewpoint discrimination claim but
not a selective enforcement claim.

The Plaintiffs claim that officials from Planned Parenthood "conspired with one or more Burlington city officials to unlawfully restrict the First Amendment rights of pro-life advocates," Pls. ¶ 34, but they have not alleged any facts supporting that assertion. It is also highly doubtful that establishing a connection between Planned Parenthood and the City Council's decision to enact the Ordinance would strengthen Plaintiffs' case. "[T]he contention that a statute is 'viewpoint based' simply because its enactment was motivated by the conduct of the partisans on one side of a debate is without support." *Hill*, 530 U.S. at 724; *see also Madsen*, 512 U.S. at 763 ("That petitioners all share the same viewpoint regarding abortion does not in itself demonstrate that some invidious content- or viewpoint-based purpose motivated the issuance of the order.").

In the absence of any evidence of an express City policy to enforce the Ordinance discriminatorily, Plaintiffs' as-applied viewpoint discrimination claim relies almost exclusively on the allegation that the City has a custom of enforcing the Ordinance at Planned Parenthood but not at Care Net.[27] The evidence before the Court is that on September 11 and October 9, a pro-choice advocacy group demonstrated within 35 feet of the entrance to

---

[27] Planned Parenthood is the only RHCF where the City has posted buffer zone warning signs; however there is no allegation or evidence that the City has denied a request to erect similar signs at Care Net.

Care Net, an RHCF with a pro-life viewpoint.  On both occasions,
employees of Care Net reported violations of the buffer zone at
approximately 5:30 in the evening and the protests ended soon
afterwards, around 6 p.m.  On September 11, a Burlington police
officer was dispatched to the scene, but did not enforce the
Ordinance even after establishing that Care Net was an RHCF and
that the protesters were within the buffer zone.  On October 9,
no officer responded until after the protest had finished.

Although the discovery process will allow the Plaintiffs to
gather more facts, their allegations concerning the September 11
and October 9 incidents are insufficient to establish a
likelihood of success on their as-applied viewpoint
discrimination claim.  The September 11 incident is noteworthy
because a responding officer allegedly failed to enforce the
Ordinance after determining that it applied, but the Court
cannot make any strong inferences from the October 9 incident.
Other than the fact that the Burlington Police were unable to
respond immediately to the buffer zone violation, the October 9
incident contributes little to the suggestion that the City has
engaged in the "pattern of unlawful favoritism" required to
demonstrate a *Monell* claim.  *Thomas*, 534 U.S. at 325.  According
to the evidence presented, the Department was unable to dispatch
a police officer to the scene immediately, as there were other
emergencies occurring at the time; however, within two hours of

Seward's report, Officer Brownell returned her call.  *See* Def.
Exs. M, N.  Officer Brownell acknowledged that the Ordinance
applied to Care Net, advised Seward to report future violations,
but explained that he would take no further action against the
protesters because they were no longer at the scene.  The
October 9 incident is therefore perfectly consistent with the
City's representation that it applies the Ordinance in a
viewpoint-neutral manner.

For these reasons, the allegations and facts currently
before the Court indicate that the Plaintiffs have not
established a likelihood of success on the merits of their as-
applied viewpoint discrimination claim.

### 2.    Time, Place, and Manner Restriction

Many of the considerations that lead the Court to dismiss
the facial challenge to the Ordinance also support the finding
that the Plaintiffs will not succeed on their as-applied time-
place-manner claim.  The discussion here is therefore limited to
the particular facts surrounding Planned Parenthood that this
Court could not consider in its facial review.

### a.    Content Neutrality

The Ordinance remains content-neutral when applied to
Planned Parenthood for substantially the same reasons mentioned
in the context of the facial challenge.  Although Planned
Parenthood provides abortions and has a pro-choice viewpoint,

the buffer zone applies to pro-choice, pro-life, and other demonstrations within 35 feet of the facility.  In fact, Burlington Police Department officers responded to a demonstration by one of the Plaintiffs' witnesses, Barry Kade, a liberal, pro-choice activist who was advocating repeal of the Ordinance within 35 feet of Planned Parenthood.  One of the responding officers, Lieutenant Stubbing, asked Mr. Kade to leave the buffer zone.  When he refused, she entered Planned Parenthood to speak to their employers—a step taken by officers responding at both Planned Parenthood and Care Net in prior incidents.  Upon Lieutenant Stubbing's return, Kade announced that he was leaving, and it is unclear whether Lieutenant Stubbing would have issued a written warning or ticket had Kade persisted in his non-compliance.  Far from revealing differential treatment of certain subject-matter, this episode suggests that the City is enforcing the Ordinance in a content-neutral manner.

### b.    Significant Governmental Interests

The Ordinance advances significant governmental interests for the same reasons explained in the Court's discussion of Plaintiffs' facial claims.

### c.    Narrow Tailoring

As applied, the Ordinance is narrowly tailored as long as the buffer zone at Planned Parenthood "promotes a substantial

government interest that would be achieved less effectively absent the regulation" and does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799 (internal quotation omitted).

Here, the Court supplements its earlier discussion only with respect to the second aspect of this standard.  The dimensions of the buffer zone at Planned Parenthood cover a relatively small portion of the public right-of-way on St. Paul Street.  The Plaintiffs may protest 35 feet to the north of the main entrance, or, if they so choose, they may stand directly across the street from the main entrance at a distance of at least 68 feet.  The burden the City imposes on Plaintiffs' speech by prohibiting them from demonstrating, patrolling, picketing, or congregating closer to Planned Parenthood is not substantially greater than necessary to accomplish the City's interests.

### d.    Ample Alternative Channels of Communication

Plaintiffs' as-applied challenge centers on the availability of alternative channels of communication.  The Plaintiffs' principal lamentation is that the particular layout of the parking lot and the main entrance to Planned Parenthood means that the buffer zone will prevent them from approaching the vast majority of individuals entering and leaving that facility.  This Court has already explained that the First

Amendment does not grant Plaintiffs the right to approach individuals entering a reproductive health care facility for the purpose of giving them leaflets or engaging them in a one-on-one conversation.  Yet Plaintiffs' as-applied grievances stem as much from the layout of Planned Parenthood as they do from the Ordinance itself.  Facing similar objections in *McCullen II*, the First Circuit responded,

> The law does not require that a patient run a public-sidewalk gauntlet before entering an abortion clinic.  That patients choose to stay on private property or not to stop their cars on approach is a matter of patient volition, not an invidious effect of the Act.  First Amendment rights do not guarantee to the plaintiffs (or anyone else, for that matter) an interested, attentive, and receptive audience, available at close-range.

2013 WL 85928 at *12.

Similar logic controls here.  The requirement that there be ample alternative channels of communication does not guarantee Plaintiffs the right to insist that a buffer zone be applied to Planned Parenthood in a manner that preserves their ability to approach patients at close range.  Instead, the requirement of ample alternative channels simply secures the Plaintiffs some means of communication with their target audience.  In this case, Plaintiffs' messages are visible and audible to individuals entering Planned Parenthood.  No more is required to satisfy this component of the time-place-manner standard.

*       *       *

For the foregoing reasons, the Plaintiffs have not established a likelihood of success on the merits of their as-applied time-place-manner claim.

### 3. Vagueness

"'[A] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2719 (2010) (quoting *Hoffman Estates*, 455 U.S. at 495 (1982)). Several of the Plaintiffs testified that they were unsure whether some of their activities, including praying, singing, and distributing handbills constitute demonstrating, patrolling, picketing, or congregating. After hearing three days of testimony about Plaintiffs' activities at Planned Parenthood, the Court has little difficulty concluding that most if not all of the Plaintiffs' activities could be fairly characterized as demonstrations.

When they are at Planned Parenthood, at least one of the Plaintiffs is typically carrying a sign that says "Pray to End Abortion" or "I REGRET MY ABORTION." Def. Exs. B, H. These signs are "intended to make people think about the long term implications of abortion." Cochran Aff., ECF No. 8-19. The Plaintiffs also attempt to distribute leaflets to persons entering Planned Parenthood. One such leaflet has contact

information for local organizations that provide alternatives to abortion, facts about the development of a fetus during the first twelve weeks of a pregnancy, and passages of scripture. Pls.' Ex. 17. The leaflet also contains a section of "abortion facts," which includes the following bullet-points:

- Abortion is a blind surgery, abortionists literally cannot see what they are doing.
- Abortion destroys precious, innocent and defenseless lives.
- Abortion can leave women feeling guilty, lonely, hurt, rejected, and depressed.
- Abortion denies families and communities the gifts and talents the aborted child alone would possess.
- This is not removing a "blob of tissue," a beating heart is stopped and a new life is ended.
- Unborn children feel pain.

*Id.*

In addition, Plaintiffs pray both silently and out-loud in front of Planned Parenthood, and they commonly recite the Rosary, the Seven Penitential Psalms, and the Prayers of Saint Bridget. During the hearing, the Court engaged Ms. Cochran in a discussion about why it was important that she engage in prayer at Planned Parenthood. Cochran explained that when she prays at Planned Parenthood, she is praying for the death taking place there.[28] When asked whether one purpose of her prayer was to express a view to someone walking into Planned Parenthood, Cochran admitted that she would not stand in front of the

_____

[28] Draft Tr. Vol. 2, 64, Jan. 29, 2013.

facility to hold a sign and say a prayer unless she wanted to communicate a message.[29]

Plaintiffs' signs, leaflets, and prayers are all intended to communicate their opposition to abortions to individuals entering and exiting Planned Parenthood. When they engage in these activities, the Plaintiffs are demonstrating. There are certainly circumstances in which the Plaintiffs may enter the buffer zone at Planned Parenthood without falling afoul of the Ordinance; however, it is unnecessary to address whether certain hypothetical combinations of activities are permissible because the vast majority of Plaintiffs' conduct is covered by the Ordinance and they are therefore barred from advancing vagueness claims premised on the Ordinance's application to the conduct of others. Accordingly, the Plaintiffs are also unlikely to succeed on the merits of their as-applied vagueness challenge.

*     *     *

Because the Plaintiffs have not demonstrated a likelihood of success on any of their as-applied claims, the Court **denies** their motion for a preliminary injunction.

## CONCLUSION

The hearing on these motions began on the fortieth anniversary of *Roe v. Wade*, 410 U.S. 113 (1973). In *Roe*, the Supreme Court recognized that the constitutional right to

---

[29] *Id.*

72

privacy encompassed a woman's decision whether or not to terminate a pregnancy. *Id.* at 153. As a country, we have engaged in vigorous debate over the merits and scope of that right; we have witnessed heated and sometimes violent exchanges at the medical facilities that make possible the choice *Roe* promised; and we have extended our compassion, counsel, and care to the women who must bear the physical and emotional burdens of that decision, irrespective of the option they elect. The Court is therefore mindful of the larger context in which this case arises, even though the question it raises is a narrow one: whether the City of Burlington may prohibit individuals from knowingly congregating, patrolling, picketing, or demonstrating within 35 feet of reproductive health care facilities.

As enacted, the Ordinance is constitutional. It restricts the place and manner in which individuals may speak but does so without discriminating on the basis of content or viewpoint. In dismissing Plaintiffs' facial claims, the Court confirms what precedent has already made clear: the City has struck a permissible balance between the First Amendment rights of protesters at reproductive health care facilities and the rights of others to access the same facilities without obstruction.

Plaintiffs' as-applied challenges remain, but they are unlikely to succeed. For that reason, the Court will not suspend enforcement of the Ordinance while this case is pending.

Unless Plaintiffs discover facts that enable them to make a stronger showing that Ordinance is enforced discriminatorily or that it forecloses their message from reaching their target audience, their as-applied claims will also fail.

Dated at Burlington, in the District of Vermont, this 15th day of February, 2013.

_/s/ William K. Sessions III
William K. Sessions III
U.S. District Judge